PAUL OAKLEY v. THE STATE.

No. 16349.   Delivered January 31, 1934.
Reported in 68 S. W. (2d) 204.

The opinion states the case.

*Bartlett & Bartlett,* of Linden, and *Ben A. Harper,* of Tyler, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, JUDGE.—The appellant was tried and convicted of the offense of murder, and his punishment assessed at confinement in the state penitentiary for a term of 50 years.

The testimony adduced upon the trial, briefly stated, is in substance as follows: On our about Wednesday, the 14th day of December, 1932, Paul and Coy Oakley visited Sherman Clayton and his family, which consisted of Sherman Clayton, his wife, and two small children. The oldest of the two children, whose name was Bernice, was 3½ years of age, was a mute, and a paralytic. Defendant is a cousin of Mrs. Clayton, the wife of Sherman Clayton. Paul Oakley and Coy Oakley, as well as Mr. and Mrs. Clayton, had embraced the Apostolic faith. Paul Oakley, the defendant, had become obsessed with the idea that he was the second Apostle Paul, and that he was endowed with the divine power to relieve the sick and afflicted. On Saturday preceding the Monday on which the alleged murder was committed, and Saturday night, Sunday and Sunday night, and Monday until in the afternoon, the neighbors continually heard praying and shouting and holloing, "Glory Hallelujah,"

at the home of Sherman Clayton. On Monday soon after noon Mr. George Wilson, a neighbor, went to the Clayton home to ascertain the cause of the continuous noise which had been in progress there for several days and nights. Upon arriving at the Clayton home he knocked on the door and Coy Oakley appeared at the door, opened it, and said to the witness, "We don't allow devils in here." The witness looked into the room and observed that the defendant, Paul Oakley, had the child Bernice on the floor beside the stove with one hand on her throat and the other hand on her forehead "churning" the child up and down with saliva flowing from her mouth. The defendant was down on his hands and knees "churning" the child up and down and rubbing her on the floor. It appeared to the witness at that time that the child was dead. The witness then returned to his home. About 5 o'clock on that afternoon, Monday the 19th day of December, defendant appeared at the home of said witness, stating that Mrs. Clayton had sent him up there for some sheets as the child was dead, to which the witness replied, "Yes, you are bound for hell," to which he said, "No, I am not. I have been to the well and prayed and got forgiveness." Defendant said he choked the child to death but he didn't do it, that the devil caused him to do it. He thought the devil choked her to death through him. The child's body upon examination disclosed a number of bruises, one on the left thigh, one on the left cheek, one over the left eye and ear, and finger prints on its throat.

The defendant's plea was insanity and in support of his plea he offered testimony which showed that defendant went to school from the time he was 7 years until he reached the age of 15, but he never did learn to read or write except barely enough to write his name; that some time in the month of July or August prior to the alleged homicide the defendant, having embraced the Apostolic faith, undertook to preach and on several occasions did preach, but when he did preach he had to have some one read a text for him as he was unable to read. He proved by numerous parties facts which indicated an abnormal mind. Three reputable physicians, namely, Dr. George Powell, Superintendent of the Terrell State Hospital, and Dr. John Turner, a specialist on nervous and mental disease, testified that they examined defendant on several occasions and reached the conclusion that the defendant is insane and was insane at the time of the commission of the alleged offense. Defendant also proved by Dr. Davis, a local physician, that Dr. Turner examined the defendant in his, Dr. Davis' office, and the said Dr. Davis observed the defendant and also reached the conclusion that he

was insane at the time of the commission of the alleged offense. The state in rebuttal proved by a number of farmers and laymen that they lived within 2½ or three miles from the home of the Oakleys; that they had known defendant for quite a while but had no dealings with him and didn't see defendant very often but saw nothing unnatural or abnormal about him. Dr. Long testified for the state that he never saw the defendant do anything, never had had a conversation with him, never associated with him, and the question of defendant's insanity never entered the mind of the witness. There was some other testimony of the same nature offered by the state in rebuttal but it is unnecessary to repeat same here.

The record before us is very voluminous and embraces 40 bills of exception. To discuss all of them would unnecessarily extend this opinion. Hence we will consider only such as present the most important questions.

By bill of exception No. 4 the appellant complains of the action of the trial court in permitting the district attorney to prove by Mrs. Newsome the following facts: "I have been knowing Sherman Clayton's family about 12 months. I attended a meeting up in that part of the county where they lived last summer at which Sherman Clayton was present and I heard him making a prayer or request for a prayer with respect to his invalid child, Bernice. He asked them for a prayer for his child that it might be healed or if it was not healed for God to take it away. I heard him make the prayer himself." By bill of exception No. 7 the appellant complains of the action of the trial court in permitting the district attorney to prove by Mrs. Olin Penny substantially the same facts set out in bill of exception No. 4, to which said testimony the defendant objected because the statement was not a statement by defendant, was not binding on defendant, and it was not shown that defendant was present and heard it, which objections were by the court overruled, and defendant excepted. Without entering upon an extensive discussion of the matter complained of in said bills, we will content ourselves with stating that we believe the defendants' position is well taken. The inference could be drawn from said testimony that Sherman Clayton desired to get rid of the child if it would not recover from its affliction and it would tend to establish a motive on the part of Sherman Clayton for the alleged murder, but so far as this record discloses Sherman Clayton was not charged with the murder of the child nor was it shown that the alleged offense was committed in pursuance of a conspiracy between the said Sherman Clayton and the defendant.

By bills of exception Nos. 5, 6, 8, 13, and 19, which relate to the same subject matter, the appellant complains of the action of the trial court in permitting the introduction of testimony of non-expert witnesses who testified that they had lived in the same neighborhood with defendant, had seen and conversed with him, had observed him at work, on the playground at school, and heard him talk to other boys, and saw nothing out of the ordinary that would indicate an abnormal mind. Under the authority of the case of Shields v. State, 283 S. W. 844, and Langhorne v. State, 289 S. W., 57, the witnesses were qualified to express an opinion as to the sanity of the defendant. In the case of Shields v. State, supra, the court said: "A non-expert witness who has shown reasonable opportunity to observe the acts and conduct of the party inquired of may state he has never observed anything which led him to believe or conclude that such party was of unsound mind or abnormal." The testimony of the witnesses as set forth in bills of exception Nos. 5, 6, 8, 13, and 19 shows that the witnesses had reasonable opportunity to observe the acts and conduct of the defendant so as to express an opinion as to his sanity.

Bills of exception Nos. 9, 10, 11, 14, 15, and 20 relate to the same matters and will be treated together. Said bills of exception show that the witnesses whose testimony was objected to by defendant had not such acquaintance, association, or conversations with the defendant, nor such an opportunity to observe his acts and conduct, as would qualify them to express an opinion as to the sanity or insanity of the defendant. However, Mrs. Snelgrove and Mrs. Newsome admitted that they could not express an opinion on defendant's mental condition as their acquaintance with the defendant was very brief and limited. Mrs. Kirkland testified that she met defendant for the first time on Tuesday morning, the day after the child was alleged to have been killed, and from her testimony we gather that she did not converse with the defendant but only saw him at the home of Sherman Clayton and never saw him since. We believe that the appellant's position is well taken and the court should have sustained his objection to said testimony and excluded it from consideration by the jury.

By bill of exception No. 16 the appellant complains of the action of the trial court in permitting the witness Mrs. Frank Mitchell to testify to statements made by Mrs. Sherman Clayton to the witness in the presence of the defendant that defendant killed the baby and that when she started to take the baby he told her not to do that as it would interfere with the Lord's work. We believe that this was admissible in view of the fact

that such statement was made in the presence of the defendant and defendant made no denial thereof; besides, it tended to prove defendant's defensive theory of insanity.

By bills of exception Nos. 24, 25, 26, 27, 28, 29, and 30, the appellant complains of the arguments by the county and district attorneys, which are too lengthy to be quoted in full here. However, for a better understanding of the arguments employed, we will quote from bill of exception No. 24, wherein it is shown that the Hon. Elmer L. Lincoln employed the following language:

"Harper said turn him loose. There are just two verdicts here. Either the verdict of guilty with death or confinement in the penitentiary or a verdict of not guilty. You cannot do but two things, send him to the electric chair or penitentiary or turn him loose. Harper says he will be taken to the County Court, that he will be tried for lunacy and send him to the asylum. A jury down there might find him sane. And how can Forest Whitworth and I stand before one jury and plead that the man is sane and then next day plead that he is insane? How can you expect us to do it? Send him to the Asylum. He will stay maybe for three months and there will be no way in the world to keep him there. If you convict him and he is insane they can get writ of habeas corpus and get him out of the penitentiary if he is crazy. If he is crazy he can be snatched from the shadow of the electric chair. I tell you that this man ought to pay and pay and pay for the crime he has committed. And then when he gets out of the asylum then to be turned loose on the little babies. Is that any of that religion that they talk about? Why, religion is on trial here. That just and undefiled religion of the master who took little children around him and blessed them and said: 'But who so shall offend one of these little ones which believe in me, it were better for him that a millstone were hanged about his neck and that he were drowned in the depth of the sea.' In the name of the Master of that religion we call upon you for a verdict of righteousness. The people of this county are on trial in this case. Justice is on trial in this case. Are we going to let it go out that a man of fanatical religion however queer and sad it might be can go and take the life of a man or child and come into court and say that he was honest and sincere about it he can be turned loose? Do you want your county and citizenship branded that way? Don't you think more of your institutions and children, of the mothers who would die for their children rather than let them die? The law is supreme in cases of that kind and should be vindicated. It does take cour-

age, it takes supreme courage to write the verdict in this case. And that verdict cries out to you to let justice in and justice demands the supreme penalty of the jury. Gentlemen of the jury, it may not be right for us to take human life in the process of the law but I believe it is, conscientiously and you believe it is and if you ever sat in a case where the supreme penalty is demanded by the facts of the case it is this."

It is contended by the appellant, and we think correctly so, that this argument was a direct appeal to religious prejudice and calculated to arouse the emotions and disregard the charge of the court and the testimony authorizing an acquittal even if he was insane at the time of the commission of the offense. The argument was an appeal to the jury to convict him of murder because if they acquitted him and turned him loose a jury in the county court may find him sane; besides the district and county attorneys could not stand before one jury one day and contend that he was sane and the next day stand before another jury and plead that he was insane. The further argument that if the jury convicted him and he was insane they could get a writ of habeas corpus and get him out of the penitentiary was an appeal to the jury to disregard their oath and shift their responsibility of determining whether he was insane at the time of the commission of the offense. This argument was not a discussion of the facts in an attempt to enlighten the jury and assist them in arriving at a just conclusion. The appellant had made what seems to us a strong showing of insanity. The death of the child was not in dispute but the religion of the appellant was not an issue save as it might have affected his mental condition, and therefore great care should have been exercised to confine the argument to a discussion of the facts relating to the mental condition of the appellant or any inference reasonably deducible therefrom. No motive for the commission of the offense was proven and apparently there was none, nor can we by any stretch of the imagination conceive of any. The religious creed, cult, or belief of the appellant, although not in accord with that of the prosecuting attorneys, should not have been used to his prejudice or as a vehicle in which to convey him to the penitentiary. The combined argument of the county and district attorneys was such a departure from the testimony and was calculated to divert the minds of the jury from the real issue to the prejudice of the defendant's legal right to a fair trial as requires a reversal of the judgment of conviction, and for authority in support of our views herein expressed we refer to the cases of Smith v. State, 55

Texas Crim. Rep., 569; Weige v. State, 196 S. W., 524; Rogers v. State, 111 Texas Crim. Rep., 419, 13 S. W. (2d) 116.

The other errors assigned most likely will not arise on a subsequent trial and therefore are not discussed.

For the errors pointed out, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.