Filed 4/28/25  P. v. Bell CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARVIN BELL,<br><br>Defendant and Appellant. | C099306<br><br>(Super. Ct. No. 22FE018077) |

Defendant Marvin Bell appeals from convictions of sexual assault, false imprisonment, and sexual battery against one victim and misdemeanor battery against a second victim.  He contends (1) the trial court abused its discretion when it admitted evidence that he asked one of the victims if she believed in God; (2) the trial court erred by not instructing sua sponte on the lesser included offense of misdemeanor false imprisonment; (3) trial counsel rendered ineffective assistance by not seeking an instruction on defendant's good character evidence; and (4) the trial court erred by not

1

staying execution of sentence on either the sexual assault conviction or the sexual battery conviction.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

A.     <u>Jamie</u> <u>Doe</u>

Jamie Doe and her friend, J.V., went to the movie theater.  They arrived about three hours before their movie started to beat the heat.  They sat in the lobby and talked while eating snacks.

Defendant walked over to the women and started talking with them.  Jamie Doe had never seen defendant before but defendant was friendly and five minutes into their conversation, he asked Jamie Doe if she was single.  She said she was.  He then asked J.V. if she was single and J.V. said no.  Defendant then kissed Jamie on her mouth.  He did not ask her if he could kiss her before he did so or indicate to her he was going to kiss her.  She did not want him to kiss her and she felt scared.  She did not know him, he was in her personal space and she told him to back off.

Defendant asked Jamie Doe if she wanted to go the family/disabled restroom.  She said she did not want to go in the restroom with him.  She told J.V. to watch her bags, and she went into the women's restroom by herself.  Two women were in the restroom when she entered.  One was in a stall, and another was using the sink.  Jamie used the large stall.  She heard defendant say, "babe, I'm right here."  When she opened the stall door, defendant was standing there.  The other two women had left.

Defendant went inside the stall, locked the door, and blocked it.  He asked Jamie Doe to show him her chest area.  She said no.  Defendant replied, " 'You're not going to leave here until you show me.' "  Jamie Doe lifted her shirt.  Defendant asked to see more of her chest area.  She again said no.  Defendant again said she was not going to leave until she showed him.  He also said, " 'You're not going to scream because nobody will

2

hear you.' " Jamie Doe felt forced to comply. She lifted her shirt and her bra. Defendant sucked on her left breast.

Jamie Doe replaced her clothing. She tried to leave the stall, but she couldn't unlock the handle. Defendant said no, and he moved so that he still blocked the door. Defendant touched her "all over." He asked her to orally copulate him. She said, "No. I want to leave." Defendant kept locking the door and touching her all over. She pushed him out of the way, unlocked and opened the door, and ran out.

She went into the lobby to the podium where theater employees checked tickets. Employees asked her what had happened, and she told them. She just stood there because she was scared and anxious. She asked the employees to call the police.

Defendant had gone outside, but he came back inside and saw Jamie Doe at the podium. He "came charging" at her. Scared, she hid behind the podium and the employees so he would not see her. Coming up to the podium, defendant told the employees that Jamie had offered to buy him a ticket and that she had taken his phone. Jamie told him she did not have his phone. An employee told him Jamie did not have his phone and did not say she would buy him a ticket. The employee told defendant to leave, which he did.

Jamie Doe sat down by J.V. and cried. Law enforcement officers arrived about an hour later and interviewed her. We discuss the interview in greater detail below.

Asked at trial why she did not call the police herself, Jamie Doe said that after what happened in the bathroom, she was scared and could not talk. She also said she did not scream out while she was in the bathroom because she could not speak due to her anxiety. Asked why she did not punch or hit him, she said she was not a violent person: "I'd rather use my words than hands."

A DNA test revealed that defendant's DNA was on Jamie Doe's chest and both breasts.

B.     <u>Nikki</u> <u>Doe</u>

Nikki Doe's given name is Jennifer, but she goes by Nikki.  Nikki worked at an apparel store for large men located near the movie theater where defendant assaulted Jamie Doe.  Kayla G. was the store's assistant manager.

On the same day he assaulted Jamie Doe, defendant went inside the apparel store.  Kayla showed him around.  In the active wear area, defendant asked Kayla whether he would look good on a date with her if he wore a particular item of clothing.  Kayla said she was sorry, but she had a boyfriend.  Defendant's comment made her feel disgusted.  He said to her, "Are you sure I can't get a hug."  She said she was okay and no thank you.  He reached up and touched her hair.  She walked away abruptly.  She went to the cash register area and told her manager what had happened.

Nikki Doe approached defendant while he was looking at suits.  At the time, she was wearing a brace on her right knee due to an injury.  Defendant commented that a particular suit would look nice for church.  Nikki agreed, bantering with him as she would with any customer.  Defendant asked if she worked there, and she said yes.  She started to walk away, but he asked for her help.  She asked him what he was looking for.  She assumed he had been looking for something for church, so she showed him some microfiber shirts that were towards the back of the store.

Defendant asked Nikki Doe if she had a boyfriend.  She didn't reply.  He asked if she went to church and if she believed in God.  She didn't feel comfortable answering the questions.  He asked her what time she got off work.  She didn't answer.  To avoid answering, Nikki kept trying to talk about the clothing and what would be a good fit for him.  But defendant grabbed her by her waist and pulled her in with his arm in "a hug motion."  He whispered something she couldn't remember.  She backed up, removed his arm from her body, and told him not to touch her.

4

Nikki Doe walked to the cash register area and told Kayla what had happened. Defendant initially followed her although he eventually left. Nikki told the store manager what had happened. Defendant then returned. He asked Nikki about her knee, how she hurt it, and could she run. Her boss saw what was happening, and defendant darted out the door. He returned to the store a third time, but the manger immediately told him to leave.

### C. <u>Verdict</u> and <u>sentence</u>

A jury found defendant guilty of the following crimes against Jamie Doe: assault with intent to commit oral copulation (count 1), false imprisonment (count 2), and misdemeanor sexual battery (count 3). (Pen. Code, §§ 220; 236; 243.4, subd. (e)(1) [statutory section references that follow are to the Penal Code unless noted otherwise].) The jury also found defendant guilty of misdemeanor battery against Nikki Doe (count 4). (§ 242.)

The trial court sentenced defendant to the lower term of two years on count 1. It imposed the lower term of 16 months for count 2 but stayed execution under section 654. It also imposed 90 days in jail for counts 3 and 4 each with credit for time served.

DISCUSSION

I

*Defendant's Question Asking Whether Nikki Doe Believed in God*

Defendant contends the trial court abused its discretion and violated his due process rights by admitting evidence that he asked Nikki Doe during their encounter whether she believed in God. He claims the evidence was unduly prejudicial under Evidence Code section 352 and rendered his trial fundamentally unfair. He argues the evidence was not probative of the battery charge against him, and it was unduly

5

prejudicial because the question's probative value was outweighed by the danger the jurors would conclude he committed the battery because he was mentally unstable.

A.    Background

Defendant moved by in limine motion to exclude from evidence his question asking Nikki Doe whether she believed in God.  He argued the evidence did not tend to prove or disprove any of the alleged crimes.  Rather, it ran the risk of allowing the jury to improperly infer that he is mentally unstable, and it resulted in the jury fearing him.  Defendant acknowledged there are different reasons why someone would ask whether one believes in God, but where there was another incident at the movie theater and where the jury would feel uncomfortable with him returning to the same store a couple of times, the question to Nikki Doe in that context "starts becoming something else."

The trial court disagreed with defendant's characterization of the question.  It agreed with the prosecutor that the jury would see the question as an attempt by defendant to get to know Nikki Doe in a close and personal way or as an introduction to proselytizing.  In context, the jury would not infer that something was wrong with defendant.

During closing argument, the prosecutor referenced the question.  She stated, "In this particular case, we know from Nikki and her response and her testimony [that defendant's touching her] was offensive to her.  And it was the defendant doing it in an offensive way because of his words.  We know that he's asking her if she's single.  Do you believe in God?  Do you go to church?  He's asking her personal questions, which she's offended by.  Right?  He's implying I'm on a dating app, that a person you try to find out a compatible match."

B.    Analysis

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  Relevant evidence is evidence that has a " ' "tendency in reason to prove or disprove any disputed

fact that is of consequence" to resolving the case.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 358, quoting Evid. Code, § 210.)

Evidence Code section 352 authorizes a trial court to exclude relevant evidence that is unduly prejudicial. A trial court may exclude relevant evidence if the evidence's "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).) Prejudicial evidence under Evidence Code section 352 is " ' "evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270.)

We review a trial court's decision to admit evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Thomas, supra*, 14 Cal.5th at p. 358.)

The trial court did not abuse its discretion in determining defendant's question was relevant. Defendant was charged with committing simple battery against Nikki Doe. To prove this offense, the prosecutor had to establish (1) defendant willfully and unlawfully touched Nikki Doe; and (2) the touching was done in a harmful or offensive manner. (*People v. Chenelle* (2016) 4 Cal.App.5th 1255, 1263; § 242; CALCRIM No. 960.) Evidence of the context in which the touching occurred was relevant for the jury to determine whether the touching was offensive.

Defendant's questions to Nikki Doe, a complete stranger, were personal. He asked her whether she had a boyfriend, whether she went to church, whether she believed in God, and what time she got off work. These questions made Nikki uncomfortable. She avoided answering them by trying to steer the conversation back to clothes shopping. It was in that context that defendant grabbed Nikki by the waist and pulled her into him. The context explained to the jury why the touching was offensive. The questions were thus admissible because they were relevant to a fact in dispute.

7

The trial court also did not abuse its discretion by admitting the evidence under Evidence Code section 352. The evidence's probative value was not outweighed by any undue prejudice to defendant. There is no reasonable probability the jury inferred from defendant's asking Nikki Doe whether she believed in God that defendant was mentally unfit. Defendant initiated conversation with her by commenting that a particular suit would look good in church. Nikki began looking for clothes for him with that purpose in mind. In that context, defendant's questions of whether she attended church or believed in God, although personal, were consistent with the conversation he had started. They did not imply that defendant was mentally ill or cause the jury to speculate about his mental fitness. In context, they would not have evoked an emotional bias in the jurors against defendant unrelated to the issues at trial.

Defendant cites to three reported cases he claims establish a "connection between evidence of a defendant's bizarre religiosity and the notion of mental instability that can engender prejudice." The cases demonstrate such a relationship can arise under certain facts, but they contrast sharply with the facts before us. In *People v. Sword* (1994) 29 Cal.App.4th 614, the defendant shot and killed the victim and told doctors that God had commanded him to kill the victim. (*Id*. at p. 619.) He applied to transfer from a state hospital to outpatient status. The Court of Appeal ruled that the trial court did not abuse its discretion in denying the defendant's application. The trial court had rejected the application in part because the expert witnesses had not explored the linkage between the defendant's religious beliefs and his actions. Defendant's religion was relevant because religion, in the form of psychotic command delusions, had played an important role in the crime. Excessive religiosity in the defendant's case was a manifestation of his psychosis. Whether his religious beliefs and excessive religiosity still indicated he continued to be dangerous was a legitimate concern. (*Id*. at pp. 631-633.)

In *People v. Hendricks* (1990) 137 Ill.2d 31 (560 N.E.2d 611) (*Hendricks*), a husband was convicted of murdering his wife and children. To establish motive, the

8

prosecution introduced evidence purporting to show that the defendant murdered his family because of a conflict between his conduct with other women and his strict religious standards. The state argued that the defendant's interactions with female models whom he had retained to model a back brace he had developed escalated to sexual aggression. This activity caused internal conflict in defendant because his strict religious standards would have required he be ostracized from his religious group due to its beliefs on marriage and divorce. (*Id*. at pp. 41-42.) The state's theory of motive was that by killing his wife, the defendant would be rid of her and could continue as a full member in his religious group. (*Id*. at p. 60.)

The Illinois Supreme Court ruled that the models' testimony was inadmissible. (*Hendricks, supra*, 137 Ill.2d at pp. 53-56.) The testimony did not establish that the defendant's interactions with the models escalated to sexual aggression, and thus its probative value for motive was outweighed by its prejudicial impact. (*Id*. at pp. 52-55.) Once the models' testimony was stricken, any evidence about the defendant's religious beliefs was irrelevant and highly prejudicial. (*Id*. at p. 56.) The evidence did not establish that the defendant would have been ostracized from his religious group due to his behavior, that ostracization was a sanction defendant feared, or that his family's death would have benefitted him. (*Id*. at pp. 56-58.)

*Oakley v. State* (1934) 125 Tex.Crim. 258 (68 S.W.2d 204) (*Oakley*), arose from the strangulation death of a severely disabled child. The defendant was a member of the Apostolic faith. He believed he was the second Apostle Paul and had power to relieve the sick and afflicted. (*Id*. at p. 259.) He told a witness the devil caused him to choke the child to death. (*Id*. at p. 260.) He pleaded insanity but was convicted of murder. (*Id*. at pp. 259-260.)

The defendant contended on appeal that the prosecution's closing argument was a direct appeal to religious prejudice and was unduly prejudicial. (*Oakley, supra*, 125 Tex.Crim. at p. 264.) The prosecutor had argued against a finding of insanity,

asserting that when the defendant was released from the asylum "to be turned loose on the little babies," was "that any of that religion that they talk about?" (*Id*. at p. 263.) The prosecutor cited a verse from the New Testament about the penalty for those who offend little children, and then asked, "Are we going to let it go out that a man of fanatical religion however queer and sad it might be can go and take the life of a man or child and come into court and say that he was honest and sincere about it he can be turned loose?" (*Ibid*.)

The appellate court ruled that the prosecution's argument rendered the trial unfair. It stated, "[T]he religion of the appellant was not an issue save as it might have affected his mental condition, and therefore great care should have been exercised to confine the argument to a discussion of the facts relating to the mental condition of the appellant or any inference reasonably deducible therefrom. . . . The religious creed, cult, or belief of the appellant, although not in accord with that of the prosecuting attorneys, should not have been used to his prejudice or as a vehicle in which to convey him to the penitentiary." (*Oakley, supra*, 125 Tex.Crim. at p. 264.)

Defendant argues that *Sword* "speak[s] to the nexus between an overemphasis on religion and mental illness," and *Hendricks* and *Oakley* "recognize the prejudice that can be engendered from the jury learning of the defendant's devotion to religion." Defendant asserts, "The same concerns apply [here] given the unusual context in which [he] asked [Nikki] Doe if she believed in God."

The same concerns do not apply here. There was no evidence or allegation that defendant's religious belief was excessive to the point of psychosis. There was no mention at all of any connection between defendant's religious beliefs and mental illness, and in their context, defendant's questions did not imply such a connection existed. Shopping for a suit for church and asking the store clerk whether she went to church or believed in God did not manifest in defendant a type of excessive or bizarre religiosity or unusual belief or behavior that could lead a reasonable person to believe defendant was

10

mentally unfit. Defendant's questions were personal and offensive in the circumstances, but they did not engender any bias or belief by the jury that defendant was mentally ill. The trial court did not abuse its discretion admitting the questions into evidence and finding they were not unduly prejudicial.

II

*No Instruction on Lesser Included Offense of Misdemeanor False Imprisonment*

A trial court must instruct on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present. (*People v. Bell* (2019) 7 Cal.5th 70, 108.) Such instructions are required when evidence that the defendant " ' " 'is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " ' " (*Id.* at pp. 108-109.)

Defendant contends the trial court prejudicially erred by not instructing the jury sua sponte on the lesser included offense to count 2 of misdemeanor false imprisonment. He argues that Jamie Doe's testimony on cross-examination and her statements to law enforcement were substantial evidence that defendant falsely imprisoned her without the use of force or menace necessary to qualify the offense as a felony.

We review a claim that the trial court erred by not instructing on a lesser included offense de novo. (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

The crime of false imprisonment is "the unlawful violation of the personal liberty of another." (§ 236.) Violating the personal liberty of another refers to restraining a person's freedom of movement. (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1121.) "Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment." (*Id.* at p. 1123.)

11

The offense is ordinarily a misdemeanor, and as a misdemeanor it requires no force beyond that necessary to restrain the victim. (*People v. Babich* (1993) 14 Cal.App.4th 801, 806.) False imprisonment becomes a felony if the imprisonment is "effected by violence, menace, fraud, or deceit." (§ 237.) For purposes of section 237, "violence" means " 'the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint.' " (*Babich*, at p. 806, italics omitted.) "Menace" means " 'a threat of harm express or implied by word or by act.' " (*Ibid*.) Misdemeanor false imprisonment is a lesser included offense of felony false imprisonment. (*Id*. at p. 807.)

There is substantial evidence on which reasonable jurors could conclude defendant was guilty of misdemeanor false imprisonment and not felony false imprisonment. This evidence comes mostly from Jamie Doe's interview with law enforcement officers after the incident and questions about the interview raised during cross examination. The interview occurred approximately an hour and 20 minutes after the incident.

Jamie Doe told the officers that after defendant followed her into the restroom, he kissed her and asked to see her chest area, so she showed him. Asked why she showed her chest to a random stranger, Jamie said she did not know, other than "[h]e was very forceful with it." Defendant touched her breasts, but Jamie did not tell the officers that defendant sucked on her breast.

The officers asked Jamie Doe if defendant had said anything to her during the incident such as " 'If you say anything, I'm going to kill you.' " Jamie said he had not. Because she was scared and nervous, she did not tell the officers that defendant had made any threats to her.

She told the officers that when she tried to get out of the bathroom, he blocked the door by "just standing there." Jamie did not tell the officers that defendant had locked the door. She asked him to move, but he refused. He wanted her to orally copulate him, but

12

she refused. Defendant asked if she was kidding, and she said no. She "pushed him out of the way" to get out of the bathroom and ran out.

The officers twice asked Jamie Doe if there was anything else she remembered about the incident. There was not.

On cross-examination, Jamie Doe testified that defendant locked the stall door. But she agreed with defense counsel that as soon as she wanted to leave the stall, she moved defendant out of the way with her arm and walked out.

On redirect, the prosecutor asked Jamie Doe if standing in front of the door was the only thing defendant did to make her feel she could not leave. Jamie replied, "Correct." Asked if there was anything else defendant did besides stand in front of the door, such as by his posture or words, that made her feel she was not able to leave, Jamie said, "Just him blocking the door." Jamie did not remember if defendant used any words about her needing to stay, nor did she recall her testimony on direct about him making a statement to her when she told him she wanted to leave. But asked why she did not push defendant to the side and leave when he walked in if she was able to do so, Jamie stated it was because defendant was stronger than her, and he had locked the door and stood in her way so she couldn't leave.

Jamie Doe's interview with law enforcement, and the discrepancies between her statements to them and her testimony at trial, was substantial evidence on which the jury could conclude that defendant committed only misdemeanor false imprisonment. Key facts from her testimony establishing defendant restrained her by violence or menace were missing from that interview. The trial court thus erred by not instructing on the lesser included offense.

We review error in not instructing sua sponte on a lesser included offense for prejudice under the state standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) Under *Watson*, defendant must show it is

13

reasonably probable he would have obtained a more favorable result absent the error. (*Ibid.*)

Even if the trial court had instructed on misdemeanor false imprisonment, it is not reasonably probable defendant would have obtained a more favorable result. The undisputed evidence shows that defendant restrained Jamie Doe by violence or menace beyond that necessary to restrain her. Defendant successfully restrained Jamie by standing in front of the stall door and preventing her from exiting the stall. Jamie testified she could not move defendant out of the way after he entered the stall in part because he was stronger than her.

But defendant took at least two additional steps to restrain Jamie Doe. First, he locked the stall door. Jamie was consistent in her testimony under direct and cross-examination that defendant locked the door behind him. Although she did not report this act to law enforcement, she also testified that when talking with the officers, there were things that did not come to her mind. At trial, she was remembering the incident as best she could from that day.

Second, defendant sexually assaulted Jamie Doe while he kept her in the stall. The additional force necessary for false imprisonment to qualify as a felony may arise from sexual assaults suffered by the victim during the course of the defendant's contact with her. (*People v. Ghipriel* (2016) 1 Cal.App.5th 828, 834.) While Jamie's statement to the officers may imply she consented to expose her breasts, she told them that defendant's request to see her chest was made forcefully. In addition, defendant did more than view her chest. He actually touched Jamie's breasts and, according to Jamie's trial testimony, sucked on one of them. The jury rejected any argument by defendant that the sexual touching inside the bathroom was consensual, and it convicted him of sexual battery.

Because defendant locked the stall door and sexually battered Jamie Doe in addition to blocking her from exiting the stall, it is not reasonably probable that defendant

would have obtained a more favorable verdict had the trial court instructed on misdemeanor false imprisonment.

III

*No Request for Instruction on Good Character Evidence*

Defendant contends his trial counsel rendered ineffective assistance by not requesting CALCRIM No. 350, a jury instruction on how the jury could consider good character evidence. The instruction states that evidence of a particular character trait of defendant's can by itself create reasonable doubt as to his guilt. He argues the omission was prejudicial because he introduced favorable character evidence, and had the instruction been given, there was a reasonable probability he would have obtained a more favorable outcome.

A.      Background

Defendant's brother, Shaad Figueroa, testified as a character witness for defendant. The two were raised together in and out of foster care and shelters until Figueroa left the foster care system at age 16. Since then, they have been in contact with each other by phone or in person during family gatherings. As of the time of trial, Figueroa was 37 years old. He is six years older than defendant.

Figueroa stated that defendant is very respectful to everyone he encounters. He is not an aggressive person, and Figueroa had not seen him be disrespectful or aggressive towards anyone.

On cross-examination, Figueroa stated he was not aware of all the allegations or evidence against defendant. If they were true, he would not classify defendant as an aggressive person, and he would still believe defendant was "overall" respectful. But he would want to know more details behind what led to the allegations. Figueroa "could never see those allegations ever fitting [defendant's] innate character."

15

B.      <u>Analysis</u>

To establish a claim of ineffective assistance of counsel, defendant must show that counsel's performance was deficient because it "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) Defendant must also show " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Ibid.*) Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact we review independently. (*In re Gay* (2020) 8 Cal.5th 1059, 1073.) We may reject a claim of ineffective assistance for lack of prejudice without addressing whether counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Assuming only for purposes of argument that counsel's not requesting CALCRIM No. 350 was deficient, we conclude counsel's omission was not prejudicial. The evidence established beyond a reasonable doubt that defendant prevented Jamie Doe from leaving the bathroom stall by standing in front of the door and locking the door. The jury agreed that defendant sexually assaulted her. The evidence also established beyond a reasonable doubt that defendant battered Nikki Doe. Had CALCRIM No. 350 been given to the jury, it is not reasonably probable the jurors would have reached a different verdict.

IV

*Not Staying Execution of Sentence on Either Counts 1 or 3*

Section 654 prohibits punishing a defendant more than once for a single physical act that violates multiple criminal statutes or for an indivisible course of criminal conduct that reflects a single intent or objective. (§ 654, subd. (a); *People v. Corpening* (2016) 2 Cal.5th 307, 311, 316 (*Corpening*).) Defendant contends the trial court violated section 654 by not staying execution of sentence on either count 1, assault with the intent to

16

commit oral copulation, or count 3, sexual battery, because both crimes were based on the same act of touching Jamie Doe's breast or, alternatively, were based on the same objective of engaging in oral copulation.

We conduct a two-step inquiry to determine whether defendant may be subjected to multiple punishments under section 654. (*Corpening, supra*, 2 Cal.5th at p. 311.) We first ask whether the different offenses were completed by a single physical act. (*Ibid*.) To answer this question, we review the evidence to determine "whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Id*. at p. 313.) If defendant committed such an action, he cannot be punished more than once for that act. (*Id*. at p. 311.) In that situation, we do not reach the second step in the analysis. (*Ibid*.)

If the different crimes involved more than a single act, i.e., a course of conduct, we consider "whether that course of conduct reflects a single ' "intent or objective" ' or multiple intents and objectives." (*Corpening, supra*, 2 Cal.5th at p. 311.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

On the other hand, if defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Because the trial court did not explicitly rule on whether section 654 should apply on either counts 1 or 3, we infer the court made the finding appropriate to the sentence it

17

imposed.  (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1045.)  We thus must affirm the sentence if an implied finding that section 654 does not apply is supported by substantial evidence.  (*Ibid.*)

Applying the two-step analysis, we conclude under the first step that substantial evidence supports the trial court's determination that the actus reus of counts 1 and 3 were separate physical acts.  The act charged as count 3, sexual battery, occurred when defendant coerced Jamie Doe to expose her breasts and he touched them and sucked on her left breast.  The act charged as count 1, assault with the intent to commit oral copulation, occurred after Jamie had replaced her clothing.  Defendant touched her "all over" and asked her to orally copulate him while restraining her in the restroom stall.

Defendant contends the prosecutor, when addressing the individual charges during her closing argument, focused on defendant's touching Jamie Doe's breast as part of both counts 1 and 3.  He argues the jury most likely based its verdicts on counts 1 and 3 on the same act—his touching Jamie's breast.

Defendant reads the prosecutor's argument too narrowly.  In explaining the element of assault in count 1 as a willful act that by its nature would directly and probably result in the application of force to a person, the prosecutor argued that touching through clothes was a sufficient actus reus to commit the offense of assault with intent to commit oral copulation, but defendant did that and more.  The prosecutor said:

"What is force?  The terms application of force and applied force mean to touch in a harmful or offensive manner.  Let's process that as far as him and what we saw.

"Jamie was crying remembering these acts.  She was emotionally upset at what the defendant did to her body.  We know from just her demeanor on the stand and her words that the touching was harmful and offensive.

"We also know that the slightest touch can be enough if it's done in a rude or angry manner.  And here he was demanding.  Right.  That's rude.  Lift up your shirt.  You don't want to cry out for help.  You don't want people to hear you.  Give me a blow job.

18

Okay. That's rude. And making contacts with another person and feeling through his or her clothing is enough.

"So it doesn't matter for this count, whether or not the defendant actually lifted her shirt and touched her bare skin. Right? Touching her through her clothing, that could have been enough. But we know in this particular case there's more. There's more acts that he did to apply force to her. And the touching did not have to cause pain or injury of any kind."

By contrast, the prosecutor expressly argued that defendant's touching of Jamie Doe's breast was the actus reus on count 3, the battery count:

"Looking at Count 3, the sexual battery. The defendant touched an intimate part of Jamie Doe. So when we're looking at that, what did he touch? He touched her breasts, right? He touched her breasts with both his hands and his mouth. Okay? The touching was done against Jamie Doe's will. And the touching was done for the purpose of sexual arousal, gratification, or sexual abuse."

The prosecutor's argument did not preclude the jury from considering defendant's touching of Jamie Doe "all over" through her clothes as the actus reus on count 1. Defendant acknowledges this fact. Indeed, the jury was instructed under CALCRIM No. 3500 that the prosecution had presented evidence of more than one act to prove defendant guilty of count 1, and the jurors had to agree on the specific act.

Defendant further acknowledges that when the charging document and the verdict forms are generic in their language and do not link specific charges to specific sex acts, which is the case here, "a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340.)

Jamie Doe testified that after defendant sucked on her breast, there was a break in the sexual activity. Then defendant touched her all over her body and asked her to orally copulate him. The touching of her body was a separate touching from the touching of her

breast. Substantial evidence established that defendant committed separate acts in committing the offenses of counts 1 and 3.

Defendant asserts that even if that is so, the trial court still erred by not staying the sentence on one of the two counts because defendant's objective in committing the two offenses was the same—to engage in oral copulation. Defendant claims the prosecutor argued as much. She stated that defendant's touching Jamie Doe's breast (the sexual battery) "was done for the purpose of sexual arousal, gratification, or sexual abuse. [¶] We know why he touched her. He wanted to get an erection because he wanted a blow job. Right? We know what his intentions were. This was for sexual arousal."

We disagree with defendant. Section 654 does not preclude punishment for each sex crime committed during a continuous attack, even if the attacks were closely connected in time. (*People v. Harrison* (1989) 48 Cal.3d 321, 336.) A "defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*People v. Perez* (1979) 23 Cal.3d 545, 553.) Thus, the single intent and objective test is narrowly applied to sex crimes. (*Ibid.*) Section 654 does not apply where a sex act was separate and distinct from and was not a means of committing or facilitating the commission of any other sex act or incidental to any other sex act. (*Id.* at pp. 553-554.)

Defendant's touching and sucking Jamie Doe's breasts were not essential parts of his assault with the intent to commit oral copulation. The sexual battery was separate and distinct and was not incidental to or the means by which the assault to commit oral copulation was accomplished. After the battery, Jamie put her clothes back in order. After the battery was complete, defendant assaulted Jamie by touching her all over her body and asking her to orally copulate him. This evidence does not indicate that defendant sexually battered Jamie to commit or facilitate in committing oral copulation. Substantial evidence thus supports the trial court's determination not to stay the sentence on either counts 1 or 3.

DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:


_____

RENNER, J.


_____

KRAUSE, J.